UNITED STATES of America,
Plaintiff–Appellee,

v.

Dennis Lee HARDWELL,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Marcel A. HARDWELL, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Dennis L. HARDWELL, Defendant–
Appellant.

UNITED STATES of America, Plaintiff–
Appellee/Cross–Appellant,

v.

Frederick D. BOWENS, Defendant–
Appellant/Cross–Appellee.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Adam STALLINGS, aka Gene Walker,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellant,

v.

Dennis L. HARDWELL; Marcel A. Hardwell, Frederick D. Bowens; Adam Stallings, aka Gene Walker, Defendants–Appellees.

Nos. 94–3376 to 94–3379, 94–
3381 and 94–3390.

United States Court of Appeals,
Tenth Circuit.

April 5, 1996.

Broc E. Whitehead, Wichita, Kansas, for Defendant–Appellant in No. 94–3377 and Defendant–Appellee Marcel Hardwell in No. 94–3390.

Kurt P. Kerns, of Redmond, Redmond & Nazar, Wichita, Kansas, for Defendant–Appellant/Cross–Appellee in No. 94–3379.

Lanny D. Welch, Assistant United States Attorney (Randall K. Rathbun, United States Attorney, with him on the brief), Wichita, Kansas, for Plaintiff–Appellee/Cross–Appellant in No. 94–3379 and Plaintiff–Appellee in No. 94–3381.

Steven K. Woodring (Michael B. Roach, on the brief), Wichita, Kansas, for Defendant–Appellant in No. 94–3381.

David M. Lind, Assistant United States Attorney (Randall K. Rathbun, United States Attorney, on the brief), Wichita, Kansas, for Plaintiff–Appellee in No. 94–3377 and Plaintiff–Appellant in No. 94–3390.

Before EBEL, LOGAN, and BRISCOE, Circuit Judges.

BRISCOE, Circuit Judge.

Dennis Hardwell, Marcel Hardwell, Frederick Bowens, and Adam Stallings appeal their convictions of conspiracy; Dennis and Marcel appeal their convictions of money laundering; and Dennis appeals his conviction of possession of cocaine with intent to distribute.[1] The four appellants also appeal their sentences. The government cross-appeals the sentences imposed on Dennis and Marcel.

Dennis, Marcel, Frederick, Adam, Myron Hardwell, Calvin Thompson, and Royal Hopkins were charged with conspiring to possess two kilograms of cocaine with intent to distribute in August 1993. 21 U.S.C. § 846. The same indictment charged Dennis and Marcel with money laundering, 18 U.S.C. § 1956, by paying $6,910 derived from cocaine trafficking to promote distribution of cocaine. Dennis was also charged in a separate indictment with possession of 7.9 grams of cocaine base with intent to distribute in May 1992, and the two cases were tried together at his request.

There were two trials. Royal was acquitted in the first trial, but the jury could not reach a verdict on the other defendants and the court declared a mistrial. In the second trial, the jury was unable to reach a verdict on Calvin and Myron, but found the remaining four defendants guilty on all counts. The court sentenced Dennis to 151 months in prison, Marcel to 108 months in prison, Adam to 97 months in prison, and Frederick to 78 months in prison.

**Factual Background**

In May 1992, Wichita police identified Dennis as a supplier of cocaine when he sold 7.9 grams of cocaine base to an undercover police officer for $500. In January 1993, he became a suspect in larger scale illegal drug trafficking when police in Texas found two and one-half kilograms of cocaine in the van he was driving.

In March 1993, Dennis consented to a search of his carry-on bag at the Dallas/Fort Worth airport and Drug Enforcement Ad-

---

**1.** As several defendants have the same last name, for the purpose of clarity and to avoid confusion for the reader, we frequently use defendants' first names.

ministration (DEA) agents found $20,895 in cash. The cash was seized after a dog trained to detect illegal drugs by scent alerted them to it. Additional cash of $20,919 was found in a bag that had been checked with Dennis Hardwell's name tag, and was seized as abandoned after he denied ownership of the bag.

In April 1993, after intercepting a drug courier from Arizona with two kilograms of cocaine intended for Dennis, DEA agents attempted a reverse sting or controlled delivery operation at the Wichita Suites Hotel. The operation failed when Dennis learned his telephone conversations with an informant about delivery of the cocaine were being recorded.

After the reverse sting operation failed, DEA agents and Wichita police engaged a confidential informant who knew Dennis to convey an offer from a fictional source in Los Angeles to sell two kilograms of cocaine for $30,000. On August 5, 1993, arrangements were made for Dennis to meet the courier the next day. An undercover police officer posed as the courier. The informant gave Dennis' pager number and a code number to the officer. The plan was for the officer to page Dennis and ask him to meet her the next day at the Ridge Plaza Inn in Wichita for a sale of two kilos of cocaine for $15,000 per kilo. A room was rented in the motel and a video camera was set up in the room. The adjoining room was rented for surveillance, and officers staked out the parking lot. The undercover officer was supplied with a false airline ticket, a rental car with a package of powder wrapped to resemble a two-kilogram package of cocaine in the trunk, and a tape recorder to record telephone conversations.

Late on the morning of August 6, the undercover officer called the pager number and received a call from a man who identified himself as Dennis. She recognized Dennis' voice from hearing a recording of his August 5 conversation with the informant. She asked if he had the money, and he replied that he did. The officer paged the number twice more from her motel room and received calls from a different man who identified himself as Dennis. In later telephone conversations, this man answered to the name "Adam." A short time later, Marcel and Frederick knocked on the door. The officer was concerned that Marcel would recognize her because they had met while she was working as a uniformed patrol officer. She opened the door part way and Marcel stated he wanted to check the merchandise. The officer told Marcel that he could not see the merchandise until she saw the money, and she closed the door.

The officer had several more telephone conversations with Adam, who asked her to call another number and have "Lie ... hook Den up on the three-way" line, which the officer did. "Lie" was the nickname of Kenny Ray Wright. From the background noise and Adam's statements, the officer believed he was speaking over a mobile phone in a moving car. During the last recorded conversation, Dennis took the phone from Adam and suggested they exchange the money for her car keys so she could count the money while they checked the merchandise. He said he was sending some of his people to the motel to carry out the deal, and he threatened to harm the informant if anything went wrong.

Meanwhile, officers observed what appeared to be counter-surveillance measures by Dennis and others in the parking lot throughout the afternoon. A Ford Escort driven by Frederick and a Ford LTD in which Dennis was a passenger met in the parking lot. An officer observed Dennis talking on a cellular phone. The driver of the LTD was not facially identified, but he was wearing the same multi-colored shirt that Adam was wearing when he was arrested. Later, a white Mustang driven by Dennis with Adam as a passenger came through the parking lot. Officers observed Calvin and Myron walking through the parking lot and checking cars.

Officers also observed what they considered to be counter-surveillance inside the motel. Marcel rented a room two doors from the undercover officer's room, next to the surveillance room. The phone in the surveillance room rang two or three times and someone knocked on the door. The undercover officer heard someone knocking on all

of the doors in the hallway and, through the peephole in her door, she saw men walking up and down the hall, but she was unable to identify them. Another officer saw Calvin and Myron walking in the hallway. These measures were similar to those observed by police during the failed reverse sting operation in April.

About two hours after their first visit, Frederick and Marcel returned to the undercover officer's room. The officer opened the door and they pushed their way inside the room. The officer asked if Marcel had the money, and he showed her a bag containing some cash. She told them the cocaine was in the trunk of her car, but did not give them the key because the amount of cash did not look like $30,000. The officer was asked if she was armed and she reluctantly showed them she was. She asked if they were armed. Marcel replied that he was not armed, but Frederick replied "I ain't no dummy" and pointed to a bulge in his waistband. The officer asked to count the money and was told someone would bring the remainder of the money.

Marcel then told the officer they were going to check for police. They took apart the telephone, unscrewed light bulbs, looked under the pillows, looked in the bathroom, checked the officer's airline ticket and car rental agreement, and telephoned the car rental company for verification. They searched her luggage and patted her down. Marcel quizzed her about California area codes and about Los Angeles, told her she looked like a police officer he knew, and then let Calvin and Myron into the room to see if they recognized her.

Marcel told the officer they were "all crew," meaning they were working for someone. He told the officer they had "a hook [source] up in Houston" who had become too expensive, and "we lost $100,000.00 and we lost 4 keys [kilograms]" but were still able to do business. Suppl. III at 7–8. Marcel said they had been doing a kilo of business a day and hoped to take delivery of cocaine once a week. He offered advice on how to avoid detection by the DEA while traveling by plane. He boasted that his partner had killed a courier for not doing business right.

The officer thought Marcel and Frederick acted like they were waiting for someone to come with the rest of the money. She continued to insist they could not see the merchandise until they brought all of the money. Marcel made several phone calls from her room and she spoke on the phone with Adam, who told her to send Marcel out of the room. While he was gone, Frederick repeated the threat to harm the informant if anything went wrong. He told the officer not to worry because they were not making a "jack move," meaning they were not going to rip her off.

Marcel returned to the room with a bag of cash, but the officer thought it looked like less than $30,000. Marcel stated it was half and she would get the rest after they checked the merchandise. The officer told Marcel to call Dennis. The call was answered by Adam, who told the officer he had the money and to send Marcel to get it. Marcel left, but returned without any additional money. Deciding it was time to end the operation, the officer gave Marcel the keys to her car, sat down with Frederick to count the money, and gave the arrest signal to the other officers at the motel.

Marcel, Myron, and Calvin met at the officer's rental car. When the trunk was opened, officers announced their presence and the three men were chased and apprehended. Adam and Dennis were arrested in the Mustang in the parking lot. Royal was found in the room Marcel had rented in the motel and was arrested.

Officers found a cellular phone and a pager in the Mustang. The last call from the cellular phone was to the motel. Stored in the pager were the phone number of the motel, the phone number of the undercover officer's room, and the code number Dennis had given the informant to enable the officer to reach him, which was the number to Dennis' pager. Records revealed that calls from the undercover officer's room matched incoming calls to Dennis' cellular phone, and that calls were made from the room rented by Marcel to the cellular phone. In addition, records showed that the undercover officer had made three-way calls to Kenny Ray Wright's phone num-

ber, that Marcel had called the car rental company, that Dennis' phone had been used to call the motel, and that his phone had been used to call a pager that was seized from Marcel at his arrest.

None of the suspects were armed and no weapons were found in the cars or rooms, but ammunition was found in the Ford Escort that Frederick had driven through the parking lot. No drugs were found. The cash brought to the undercover officer totaled $6,910. Dennis had approximately $1,940 in his pockets when he was arrested, and Marcel had $905 and keys to the undercover officer's room and the room rented by Marcel.

Marcel denied he made an agreement with anyone to buy cocaine. He testified that the informant was a former girlfriend and he went to the motel because she asked him to do her a favor by picking up a package and giving it to a man named Leo. He testified the informant gave him the money to pay for the package and, at least in the beginning, he had no idea what was in the package. According to Marcel, Frederick merely gave him a ride to the motel and believed Marcel was going to meet a girl. Marcel met Leo in the parking lot, coincidentally ran into Adam and two other friends and told them there would be a party later, and rented a room for the party.

Marcel testified that many of the phone calls were about the party and other conversations were with Leo, to whom he had given Dennis' cellular phone. He testified his statements about drug dealing were "just making conversation" and an explanation for why he no longer dealt drugs. Although he became suspicious and thought he recognized the officer, he was not worried that he might be arrested because he trusted the informant. He explained the presence of Calvin and Myron as coincidental; they came to the motel to call for help because of a flat tire.

## I. Sufficiency of Evidence—Conspiracy and Cocaine Possession

■ Dennis contends there was insufficient evidence to support his conviction of conspiracy. When the sufficiency of evidence supporting a verdict is challenged on appeal, the court views the evidence in the light most favorable to the government to determine if any rational trier of fact could find the defendant guilty beyond a reasonable doubt. All reasonable inferences are drawn in favor of the verdict, and credibility issues are resolved in favor of the verdict. *See United States v. Horn*, 946 F.2d 738, 741 (10th Cir. 1991).

Dennis bases his argument on an assertion that the only agreement shown by the evidence was between him and the informant. He argues there can be no conspiracy between a single defendant and a government agent or informant; the defendant must conspire with at least one true conspirator. *See United States v. Barboa*, 777 F.2d 1420, 1422 (10th Cir.1985). However, there was ample evidence of an agreement between Dennis and the other defendants.

■ Conspiracy and the fact of an agreement may be proved by either direct or circumstantial evidence. The jury may infer an agreement constituting a conspiracy from the acts of the parties and other circumstantial evidence indicating concert of action for the accomplishment of a common purpose. *United States v. Ramirez*, 63 F.3d 937, 945 (10th Cir.1995).

■ The evidence supports an inference that on August 5 and 6 the defendants coordinated their actions toward the common goal of buying cocaine. Some of the defendants conducted counter-surveillance in the parking lot and others in the motel. Marcel and Frederick went to the undercover officer's room to carry out the purchase, and they were in regular telephone contact with Adam and Dennis, who, it can reasonably be inferred, coordinated activities from a car in the parking lot.

■ Dennis argues he was not adequately identified as the person who conducted most of the negotiations over the telephone because the undercover officer was unable to identify his voice from tapes prepared by defense counsel of four persons reading a section of the constitution. However, the officer testified that she recognized Dennis' voice over the phone at the motel because

she had heard him speak in his recorded conversation with the confidential informant on August 5. Moreover, he identified himself as Dennis over the phone, and telephone records showed that calls to the motel had been made from the cellular phone found in the car Dennis was in at the motel parking lot. Given our scope of review, this credibility issue must be resolved in favor of the verdict. See *Horn*, 946 F.2d at 741.

■ Dennis' additional contention that there was insufficient evidence to support his conviction of possession of cocaine with intent to distribute is without merit. The evidence against him was overwhelming. In May 1992, he sold cocaine to an undercover police officer, who identified him by photographs and by the license tag number of his car.

## II. Sufficiency of Evidence— Money Laundering

Dennis and Marcel contend there was insufficient evidence to support their convictions for money laundering. They argue there was insufficient evidence to establish that the cash offered to the undercover officer on August 6 was from specified illegal activity, one of the elements of the money laundering charge. See 18 U.S.C. § 1956(a)(1)(A)(i).

■ The money laundering statute requires the government to prove that money used in the charged transaction was derived from proceeds of illegal activity. *United States v. Torres*, 53 F.3d 1129, 1136 (10th Cir.), *cert. denied* —— U.S. ——, 116 S.Ct. 220, 133 L.Ed.2d 150 (1995). However, it does not require the government to trace the money to a particular illegal drug transaction. *See United States v. Jackson*, 983 F.2d 757, 766 (7th Cir.1993). Evidence that a defendant was engaged in drug trafficking, and had insufficient legitimate income to produce the money used in a transaction is sufficient to establish that the money was derived from proceeds of drug distribution. *See United States v. Puig–Infante*, 19 F.3d 929, 940 (5th Cir.), *cert. denied* —— U.S. ——, 115 S.Ct. 180, 130 L.Ed.2d 115 (1994).

■ Here, there was evidence that Dennis and Marcel were engaged in drug trafficking and that neither of them had any significant legitimate sources of income since Marcel stopped working for Continental Air Lines in March 1993. An IRS agent testified that, in his opinion, the money seized at the motel was proceeds from drug trafficking because of Dennis' and Marcel's lack of legitimate income. The evidence was sufficient to support an inference that the money was from cocaine distribution.

## III. Fifth Amendment Claim—Admission of Financial Affidavit and Other Statements Made by Marcel Hardwell to Qualify for Appointed Counsel

The evidence of Marcel's lack of legitimate sources of income consisted of statements Marcel made in court and in an affidavit to establish his eligibility for appointed counsel. He now contends admission of his statements into evidence violated his rights under the Fifth and Sixth amendments. He argues the government cannot use statements made by a defendant to qualify for appointed counsel as part of its direct case against a defendant at trial because a defendant must be able to assert the right to counsel without risking self incrimination. The record does not show that Marcel objected to this evidence before the district court.

In *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the Supreme Court held that a defendant's testimony at a suppression hearing to establish standing to object to a search cannot be used against him at trial to establish guilt because otherwise, the defendant would be required to choose between the Fourth Amendment right to be free from unreasonable searches and the Fifth Amendment right against self incrimination. The Court has limited *Simmons* in some respects, *see McGautha v. California*, 402 U.S. 183, 211, 212, 91 S.Ct. 1454, 1469, 1469–70, 28 L.Ed.2d 711, (1971), but has not ruled on whether statements made by a defendant to establish eligibility for appointed counsel are admissible at trial as proof of guilt. *See United States v. Kahan*, 415 U.S. 239, 242–43, 94 S.Ct. 1179, 1180–81, 39 L.Ed.2d 297 (1974).

Several circuits have followed the reasoning of *Simmons* and held that a defendant is

entitled to some sort of protection against the use of financial disclosures made to establish eligibility for appointed counsel. In the absence of some protection, a defendant would be forced to choose between the Sixth Amendment right to counsel and the Fifth Amendment right against self incrimination. *See United States v. Hitchcock,* 992 F.2d 236, 239 (9th Cir.1993); *United States v. Pavelko,* 992 F.2d 32, 34–35 (3d Cir.), *cert denied* —— U.S. ——, 114 S.Ct. 272, 126 L.Ed.2d 223 (1993); *United States v. Gravatt,* 868 F.2d 585, 589–92 (3d Cir.1989); *United States v. Sarsoun,* 834 F.2d 1358, 1363–64 (7th Cir. 1987); *United States v. Harris,* 707 F.2d 653, 662–63 (2d Cir.), *cert. denied* 464 U.S. 997, 104 S.Ct. 495, 78 L.Ed.2d 688 (1983). Some courts have held that this protection may be offered before trial, either by granting the defendant use immunity or by conducting the indigence hearing in camera and sealing the record. *See Gravatt,* 868 F.2d at 590.

In *United States v. Peister,* 631 F.2d 658, 661–62 (10th Cir.1980), *cert. denied* 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981), this circuit rejected the pretrial protection approach without resolving whether use of a defendant's financial affidavit and other statements made to obtain appointed counsel violates the Fifth Amendment. In *Peister,* the defendant, fearing self incrimination, refused to fill out a financial affidavit unless the court granted him immunity. The court rejected the defendant's argument that this violated his right to counsel, concluding that any conflict between the defendant's Fifth and Sixth Amendment rights was speculative until and unless the government attempted to use the information at trial. The court was unwilling to assume the government would attempt to use the information at trial or that the trial court would allow it. *See also Sarsoun,* 834 F.2d at 1364; *Harris,* 707 F.2d at 662–63.

▮ Here, the conflict between Fifth and Sixth Amendment rights is not speculative. The government used Marcel's financial affidavit and other statements he made to establish eligibility for appointed counsel to prove guilt at trial. We conclude that use of those statements at trial violated Marcel's Fifth Amendment right against self incrimination. *See Pavelko,* 992 F.2d at 34–35.

▮ Although neither the Supreme Court nor this court has decided the issue, given the weight of authority from other circuits, we conclude that the error was sufficiently clear and obvious to be plain error as defined in *United States v. Olano,* 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). The error was also sufficiently prejudicial to constitute plain error. *See Olano,* 507 U.S. at 732–37, 113 S.Ct. at 1777–79.

Marcel's statements about his financial condition had little relevance to the conspiracy charge, and could not have affected the verdict on that charge. However, the evidence of Marcel's lack of legitimate income was important evidence to support the money laundering charge. The prosecutor referred to it in closing argument, pointing out the Hardwells had no significant income but had approximately $10,000 in cash between them at the motel on August 6, and arguing the source of the money had to be from prior cocaine distribution. The evidence that Marcel lacked sufficient legitimate income to raise the money for his defense was essential to his money laundering conviction. Because drug traffickers may also have legitimate income, in the absence of proof to the contrary, it cannot be concluded beyond a reasonable doubt that all their money is drug money or that the money used in the charged transaction is drug money. *See United States v. McDougald,* 990 F.2d 259, 261–62 (6th Cir.1993). We conclude that admission of Marcel's financial affidavit and other statements he made to establish eligibility for appointed counsel had a prejudicial impact on the jury's deliberations on the money laundering charge. Marcel's money laundering conviction is reversed.

### IV. Double Jeopardy Marcel Hardwell

▮ Marcel contends in his supplemental brief that his prosecution for money laundering and conspiracy to distribute cocaine after forfeiture of the $7,815 seized from him upon his arrest subjected him to double jeopardy. Although Marcel did not raise this issue before the district court, failure to raise a double jeopardy issue in district court does not

preclude an appellate court from addressing it for the first time on appeal. *See United States v. 9844 South Titan Court*, 75 F.3d 1470, 1481 (10th Cir.1996).

However, this court can consider only issues for which the record provides a factual basis. *See United States v. Vasquez*, 985 F.2d 491, 494–95 (10th Cir.1993). The record does not show that the money was forfeited, only that it was turned over to the United States Marshal's Service after it was seized at the motel.

Documents in the appendix of Marcel's brief indicate the government may have commenced administrative forfeiture proceedings under 21 U.S.C. § 881, but these documents do not show the district court's "filed" stamp, *see* 10th Cir. R. 30.1.3, and there is no other indication they were filed with the district court in this case. Because the issue was not raised before the district court, there is no reason why they would have been filed. Documents not filed in the district court in this case are not in the record on appeal as defined by Fed. R.App. P. 10(a).

In any case, the facts as asserted in the briefs do not establish that the double jeopardy clause was violated. The parties agree that the government commenced forfeiture proceedings after their indictment, that Marcel did not contest the forfeiture by filing a claim, and that the money was administratively forfeited to the United States late in 1993, before the trial on the criminal charges. Although a civil forfeiture proceeding and a criminal prosecution based on the same conduct can constitute double jeopardy, *see 9844 South Titan Court*, 75 F.3d at 1483, a person who fails to contest a forfeiture by filing a claim is not a party to that proceeding and is not punished or placed in jeopardy by it; accordingly, criminal prosecution for the conduct on which the forfeiture is based does not subject the defendant to multiple punishment for the same offense or place him in double jeopardy because there was no former punishment or jeopardy. *United States v. German*, 76 F.3d 315, 318–19 (10th Cir.1996). Having failed to file a claim in the forfeiture proceeding, Marcel cannot claim double jeopardy. His argument that he was prohibited from filing a claim because he was

in prison is without support in the record. Although he was in custody, the record does not show whether that prevented him from filing a claim.

### Dennis Hardwell

Dennis raises a similar double jeopardy issue in his discussion of the sufficiency of the evidence of money laundering. He argues that use of evidence of the money seized from him at the Dallas–Fort Worth airport in March 1993 to prove money laundering subjected him to double jeopardy because the money was already forfeited to the government. Because the record does not show that Dennis raised this issue before the district court, our review is limited to determining whether he has established plain error.

The record shows that Dennis filed a petition for remission or mitigation of forfeiture, but there is no evidence that he contested the forfeiture by filing a claim of ownership and cost bond. His failure to file a claim of ownership is fatal to his double jeopardy argument. In *German*, 76 F.3d 315, the defendant's truck was seized when he was arrested for transporting over 700 pounds of marijuana. This court held where the defendant did not judicially contest the forfeiture of his truck by filing a claim of ownership and cost bond, but elected to pursue only his administrative remedy by filing a petition for remission, jeopardy did not attach. As regards the truck forfeiture, this court held the defendant was never placed in jeopardy or punished in any constitutional sense because he was not a party to any proceeding designed to adjudicate his personal culpability. Therefore, the defendant's subsequent criminal prosecution for possession with intent to distribute the marijuana was not barred by double jeopardy. Dennis' situation mirrors that of the defendant in *German* and, as a consequence, his double jeopardy argument also fails.

Moreover, the forfeiture proceeding could only have placed Dennis in jeopardy for acquiring the money seized at the airport in a drug transaction, or for attempting to use it in a drug transaction. Those are not the same crimes for which he was

prosecuted in this case. Separate prosecutions or additional punishments for separate criminal transactions on separate occasions do not violate double jeopardy. *See United States v. Felix,* 503 U.S. 378, 385–86, 112 S.Ct. 1377, 1382–83, 118 L.Ed.2d 25 (1992); *United States v. Jordan,* 890 F.2d 247, 251–52 (10th Cir.1989) (prosecution for four counts of making a false statement to an insured savings and loan did not violate double jeopardy; defendant made four false statements on separate occasions).

To establish the money laundering charge under 18 U.S.C. § 1956(a)(1)(a)(i) in this case, the government had to prove that the money was derived from the proceeds of unlawful activity. *See Torres,* 53 F.3d at 1136. Although the money seized at the airport in March 1993 may have been the proceeds of cocaine distribution, it was obviously not the money used in the conspiracy to distribute cocaine in August 1993. Although the seized money may have been intended for use in the purchase of cocaine, that purchase did not occur, and could not have been the source of the money used in August.

■ The act or transaction for which the money was seized at the airport was not the act or transaction that produced the money used in August. It was simply evidence that Dennis was engaged in cocaine distribution. Use of the same evidence to prove different offenses does not by itself violate the Double Jeopardy clause. *See United States v. Dixon,* 509 U.S. 688, —— – ——, 113 S.Ct. 2849, 2860–64, 125 L.Ed.2d 556 (1993); *Felix,* 503 U.S. at 385–86, 112 S.Ct. at 1382–83.

### V. Racial Composition of Jury Venire

Dennis contends he was denied a jury representing a fair cross-section of the community because there was only one African–American in the jury venire. All defendants joined in an objection to the racial composition of the venire in the trial court. The trial court denied the objection, noting that venires were drawn from voter registration lists, and concluding defendants had not shown the racial composition of the venire was the result of anything other than random selection.

■ To establish a prima facie violation of the requirement that a jury represent a fair cross-section of the community, a defendant must show that the group excluded is a distinctive group in the community, that the representation of the group in jury venires is not fair and reasonable in relation to the number of such persons in the community, and that the group's under-representation is due to the systematic exclusion of the group in the jury selection process. *See Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 668–69, 58 L.Ed.2d 579 (1979).

■ Dennis has not shown that under-representation of African–Americans on his jury venire was the result of systematic exclusion, but simply argues that systematic exclusion can be inferred from the under-representation in a single venire. This argument is without merit. *See United States v. Robertson,* 45 F.3d 1423, 1439 (10th Cir.), *cert. denied* —— U.S. ——, 116 S.Ct. 133, 133 L.Ed.2d 81 (1995). *Cf. Duren,* 439 U.S. at 366–67, 99 S.Ct. at 669–70 (showing of systematic underrepresentation of women in weekly venires justified inference of systematic exclusion due to automatic exemption from jury service granted to women upon request).

### VI. Stallings' Motion for Severance

■ Adam contends the trial court erred by denying his motion for severance under Fed.R.Crim.P. 14. Denial of a motion for severance is subject to reversal only for abuse of discretion. *United States v. Scott,* 37 F.3d 1564, 1579 (10th Cir.1994), *cert. denied* —— U.S. ——, 115 S.Ct. 1324, 131 L.Ed.2d 203 (1995). It is preferred that persons charged together with conspiracy be tried together. 37 F.3d at 1579. Severance is required by Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. *Zafiro v. United States,* 506 U.S. 534, 539, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993).

*Zafiro* recognized that evidence admissible only against some co-defendants can create the risk of an unfair trial for the other co-defendants. 506 U.S. at 539, 113 S.Ct. at

938. Adam argues he was prejudiced by the "spillover effect" of prior crimes evidence that was admitted against his co-defendants. However, in *Zafiro*, the Court also stated that limiting instructions are ordinarily sufficient to cure potential prejudice. 506 U.S. at 540–41, 113 S.Ct. at 938–39.

Here, when prior crimes evidence was admitted against Adam's co-defendants, the court repeatedly instructed the jury that the evidence could be considered only against the defendants involved in the prior crimes. Although the court did not follow the preferred practice of repeating that limiting instruction in the final charge to the jury, *see United States v. Harrison*, 942 F.2d 751, 760 (10th Cir.1991), it did instruct that each charge and the evidence pertaining to it should be considered separately, and that no one was on trial for any offense not charged in the case. The court also instructed the jury that in determining whether a defendant was a member of a conspiracy, "you are not to consider what others may have said or done" and that "membership in such a conspiracy must be established as to the defendant by the evidence in the case of his own conduct, what he himself willfully said or did." R I 267, instr. 20. The contemporaneous and final instructions were sufficient to cure any prejudice. *See Zafiro*, 506 U.S. at 540–41, 113 S.Ct. at 938–39; *United States v. Emmons*, 24 F.3d 1210, 1219 (10th Cir.1994).

Moreover, the evidence against Adam was sufficiently strong to dispel the argument that he was convicted only because of the spillover effect of evidence admitted against his co-defendants. *See United States v. Rogers*, 921 F.2d 975, 984 (10th Cir.), *cert. denied* 498 U.S. 839, 111 S.Ct. 113, 112 L.Ed.2d 83 (1990). There was substantial circumstantial evidence identifying him as one of the two men who negotiated for the cocaine over the telephone. The undercover officer testified that she negotiated with a man named Adam and that she believed he was speaking over a telephone from a moving car, and Adam was arrested in the motel parking lot in a car with Dennis, whose voice was identified as that of one of the men who negotiated over the phone. The records of the cellular phone and pager found in the car showed that it had been used to contact the undercover officer at the motel. There was also evidence that Adam was driving the LTD through the motel parking lot in apparent counter-surveillance; Dennis was observed in that car, speaking over a telephone. In addition, the jury's inability to reach a verdict on Myron and Calvin suggests that the jury was able to compartmentalize the evidence against each defendant. *See United States v. Wacker*, 72 F.3d 1453, 1468 (10th Cir.1995).

Adam's reliance on *United States v. Gallo*, 668 F.Supp. 736 (E.D.N.Y.1987), is misplaced. There, the trial court granted severance in a complex RICO conspiracy case involving 16 defendants and 22 counts, ranging from obstruction of justice and labor racketeering to murder. Here, the conspiracy was to commit a single offense; there were only six defendants, all charged with conspiracy, and the disparity in culpability did not approach that in *Gallo*. The case was not so complex, the number of defendants so great, or the disparity in culpability of the defendants so extreme that severance was required. *See United States v. Linn*, 31 F.3d 987, 992–93 (10th Cir.1994).

## VII. Joinder—Dennis Hardwell

Dennis was charged in two separate indictments, one charging him and other defendants with money laundering and conspiracy to distribute two kilograms of cocaine in August 1993, and the other charging him only with distributing 7.9 grams of cocaine in May 1992. At his request, the two cases were tried together. He now contends this was improper.

This argument is without merit. A defendant cannot invite a ruling and then have it set aside on appeal. *See United States v. Burson*, 952 F.2d 1196, 1203 (10th Cir.1991), *cert. denied* 503 U.S. 997, 112 S.Ct. 1702, 118 L.Ed.2d 411 (1992). The issue cannot be reviewed for plain error. Errors that are waived rather than merely forfeited through failure to object are not subject to plain error review. *See Olano*, 507 U.S. at 732–34, 113 S.Ct. at 1777.

We reject Dennis' argument that he was entitled to be tried separately from his codefendants under Fed.R.Crim.P. 8(b). Joinder was proper under Rule 8(b). Because Dennis was charged in every count of the indictments, he was not entitled to severance of his trial from that of his codefendants. *See United States v. Cox,* 934 F.2d 1114, 1119 (10th Cir.1991).

## VIII. 404(b) Evidence

All four defendants contend the trial court abused its discretion by admitting evidence of prior bad acts under Fed.R.Evid. 404(b). We conclude that, although there were defects in the manner in which the evidence was offered and admitted, any error was harmless.

Defendants challenge admission of evidence on the following incidents:

1) Dennis' sale of 7.9 ounces of cocaine to an undercover officer in May 1992;

2) Seizure of two and one-half kilograms of cocaine from the van driven by Dennis in Texas in January 1993;

3) Dennis' possession of over $40,000 in cash, some of it tainted by illegal drugs, at the Dallas/Fort Worth airport on March 21, 1993;

4) Dennis' and Marcel's presence at the Wichita airport on March 30, 1993, where they appeared nervous to a DEA agent;

5) Dennis' and Marcel's apparent attempt to take delivery of two kilograms of cocaine at the Wichita Suites Hotel in April 1993;

6) The presence of small quantities of cocaine and marijuana and $3,000 in cash in a car driven by Marcel in May 1993;

7) The presence of cocaine and a gun in an apartment at which Frederick and Myron were present in September 1992;

8) The presence of cocaine and a gun in a car driven by Myron in July 1992; and

9) Calvin's possession of cocaine in September 1992.

Defendants also complain evidence that Dennis processed powder cocaine into crack cocaine in Wichita was admitted. However, the court sustained a defense objection to that evidence and admonished the jury to disregard it.

We do not address the admissibility of the evidence of prior acts of Myron and Calvin. As discussed, the court's limiting instructions were sufficient to prevent prior acts of those defendants, who were not convicted, from prejudicing the other defendants. We reject Adam's' 404(b) argument because he was not involved in any of the prior incidents and none of the 404(b) evidence was admitted against him. The court's limiting instructions were sufficient to prevent the evidence of the other defendants' prior acts from prejudicing Adam.

Fed.R.Evid. 404(b) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The rule also requires the prosecution in a criminal case to give advance notice of intent to use such evidence.

■■■ Admission of evidence under 404(b) is reviewed for abuse of discretion. There are four requirements for admissibility under 404(b). The evidence of other crimes, wrongs or acts must be introduced for a proper purpose, must be relevant, must have probative value that is not substantially outweighed by the potential for unfair prejudice; and, on request, the trial court must give a jury instruction limiting the evidence to the proper purpose. *See Huddleston v. United States,* 485 U.S. 681, 691–92, 108 S.Ct. 1496, 1502, 99 L.Ed.2d 771 (1988).

■■■ In addition, the government must precisely articulate the purpose for which the evidence is offered, and the trial court must specifically identify the purpose for which it is admitted. However, failure to do so is harmless error if the purpose for admitting the evidence is apparent from the record and the decision to admit it is correct. *See United States v. Kimball,* 73 F.3d 269, 272 (10th Cir.1995).

Here, the government did not consistently give precise reasons for offering the evidence and, although the district court ruled before trial that the evidence was admissible to prove knowledge and intent, the court was not so specific in its instructions to the jury. However, we conclude it is apparent from the record that the evidence was admitted to prove knowledge and intent to commit conspiracy and as direct proof of the money laundering and the 1992 cocaine sale charge.

### Admissibility Against Dennis Hardwell and Marcel Hardwell as Direct Evidence of Charged Crimes

█ The evidence of incidents involving Dennis and Marcel was admissible as direct evidence of charged crimes regardless of whether the requirements of Rule 404(b) were satisfied. Rule 404(b) applies only to prior crimes evidence that is extrinsic to the charged crimes. *See United States v. Johnson*, 42 F.3d 1312, 1316 (10th Cir.1994), *cert. denied* — U.S. —, 115 S.Ct. 1439, 131 L.Ed.2d 318 (1995).

█ Dennis was charged with the May 1992 cocaine sale to the undercover officer. Evidence of that sale was direct evidence of one of the charged crimes. Evidence of other incidents tending to show that Dennis and Marcel were engaged in distribution of cocaine was also direct evidence of the money laundering charge, which required proof that the money used in the charged conspiracy to buy cocaine in August 1993 was from cocaine sales. *See Torres*, 53 F.3d at 1136. The evidence was not extrinsic to charged crimes. Consequently, the court did not err by admitting evidence of prior misconduct by Dennis and Marcel, regardless of whether the Rule 404(b) requirements set out in *Huddleston* were satisfied.

### Admissibility to Prove Intent to Commit Charged Crime

█ Evidence of the prior incidents was also admitted to show defendants' knowledge of and intent to engage in a conspiracy to distribute cocaine. Knowledge and intent are proper purposes for other crimes evidence under Rule 404(b). The introduction of evidence of prior drug distribution to show

intent and knowledge in a drug trafficking offense is appropriate. *See Ramirez*, 63 F.3d at 942–43.

█ To be relevant, 404(b) evidence must relate to a matter that is at issue in the case. *United States v. Bakke*, 942 F.2d 977, 982–83 (6th Cir.1991). Here, intent and knowledge were at issue. Intent was an element the government was required to prove beyond a reasonable doubt, and the theory of the defense was that defendants' presence at the motel was innocent. Marcel testified he was there to do a favor for a girlfriend and, at least at the start, had no idea the favor involved picking up a package of cocaine. He also testified that Frederick had merely given him a ride, and that Myron and Calvin were there because their car had a flat tire and they had called Dennis for help. Evidence of prior drug distribution was relevant to show their presence at the motel was not innocent, and that they intended to distribute cocaine. *See United States v. Deninno*, 29 F.3d 572, 577 (10th Cir.1994), *cert. denied* — U.S. —, 115 S.Ct. 1117, 130 L.Ed.2d 1081(1995). Evidence of prior drug distribution was also relevant to negate Marcel's entrapment defense, which placed at issue his intent and predisposition to distribute cocaine. *See United States v. Mendoza–Salgado*, 964 F.2d 993, 1002 (10th Cir. 1992).

However, this does not resolve whether evidence of each incident was admissible under Rule 404(b). The incidents must be examined separately to determine whether they involved prior drug distribution and were therefore relevant to defendants' intent, and whether the risk of unfair prejudice outweighed the probative value of the evidence of each incident.

### Dennis Hardwell

█ Most of the prior incidents involving Dennis clearly tended to show he was involved in prior drug distribution, and were therefore relevant to his intent to commit the charged crime. His cocaine sale to the undercover officer, the discovery of two kilograms of cocaine in the van he was driving in Texas, and his apparent attempt to take de-

livery of two kilograms of cocaine at the Wichita Suites Hotel in April 1993 all involved cocaine distribution. Although no cocaine was found when over $40,000 was seized at the Dallas/Fort Worth airport, the record would support a reasonable inference that the money was derived from and intended for use in drug trafficking. A dog trained to detect illegal drugs by smell alerted officers to the cash seized from Dennis. Further, an individual's possession of large amounts of cash tends to show involvement in drug distribution because it is among the tools of the trade of drug traffickers. *See Mendoza–Salgado,* 964 F.2d at 1008.

■ Although the district court did not expressly weigh the probative value of the evidence against the risk of unfair prejudice, by admitting the evidence the court implicitly determined the probative value was not substantially outweighed by the risk of unfair prejudice. *See Johnson,* 42 F.3d at 1315. The evidence of these incidents was relevant and had substantial probative value to prove Dennis' intent. Although the evidence was very prejudicial, the court did not abuse its discretion in admitting it to prove intent.

■ One incident involving Dennis, however, had limited relevance. His mere presence with Marcel at the Wichita airport on March 30, 1993, had little tendency to show they were engaged in drug trafficking. The admission of this evidence may have been an abuse of discretion if anyone had objected to its admission. We need not resolve that question, however, because the evidence against Dennis and Marcel was overwhelming. Any error in admitting the evidence of this one incident was harmless.

### Marcel Hardwell

As discussed, Dennis' and Marcel's mere presence at the Wichita Airport on March 30, 1993, had little probative value and little relevance to intent to commit the charged conspiracy. However, the other prior incidents involving Marcel tended to show prior drug distribution and were relevant to show intent.

■ The presence of small amounts of cocaine and marijuana in the car Marcel was

driving in May 1993 tends to show prior drug distribution because the search of the car also revealed $4,000 of cash. As previously stated, large sums of cash are among the tools of the trade of drug traffickers. *See Mendoza–Salgado,* 964 F.2d at 1008.

■ The Wichita Suites Hotel incident clearly involved cocaine distribution; the reverse sting operation was the result of law enforcement interception of two kilograms of cocaine intended for delivery to Dennis. The incident is relevant to Marcel if there was sufficient evidence to permit a reasonable conclusion that the acts occurred and that he was one of the actors. *See Huddleston,* 485 U.S. at 689, 108 S.Ct. at 1501; *United States v. Reddeck,* 22 F.3d 1504, 1509 (10th Cir. 1994).

There was sufficient evidence of Marcel's role in the incident. He knew how the reverse sting operation had been revealed; he testified that he heard the police talking over the phone during the operation, and came to the hotel to ask why the informant was trying to "set up" Dennis. Marcel's recorded statement in the undercover officer's room in August 1993 that "we" lost four kilos in the past also supports an inference that he was involved in the incident, which was the result of government interception of two kilos of cocaine intended for delivery to Dennis.

■ We conclude the evidence of the drugs and cash found in the car Marcel was driving in May 1993 and his involvement in the Wichita Suites Hotel incident in April 1993 had sufficient probative value and relevance to support the court's implicit determination that it was not outweighed by the risk of unfair prejudice. While it may have been error to admit the evidence of the Wichita airport incident against Marcel, the evidence against him was so overwhelming that any error in admitting prior crimes evidence was harmless. The strongest and most damaging evidence against him was the August 6 videotape which showed him actively involved in the negotiation for the purchase of cocaine.

### Frederick Bowens

■ Frederick was involved in only one of the prior incidents. During the execution

of a search warrant at the residence of a suspected crack dealer in September 1992, police found Myron in the living room and Frederick hiding in a closet. The bulk of the cocaine and cash found at the apartment was next to Myron. The closet where Frederick was hiding also contained an unspecified amount of crack cocaine and a gun. Frederick was arrested, but not charged. He told police that the resident of the apartment was selling cocaine, but that he was not involved, and said he had found the gun at the house two hours before the police arrived. The gun was admitted into evidence in the present case. The circumstances surrounding Frederick's arrest might suggest that he was involved in drug dealing, but could also be consistent with buying for personal use rather than distribution, or with simple presence at the apartment.

Because the gun was admitted into evidence against Frederick, the risk of unfair prejudice was substantial. Although Frederick indicated to the undercover officer on August 6 that he was armed, no gun was found. The court may have abused its discretion by admitting the gun, and perhaps all evidence of the September 1992 incident, because of its limited relevance. However, we need not resolve this question because the evidence against Frederick was overwhelming and, therefore, if admission of this challenged Rule 404(b) evidence was error, it was harmless error. Like Marcel, Frederick was also caught on the August 6 videotape assisting in the negotiations for the purchase of cocaine.

### Limiting Instructions

■ The limiting instructions given by the district court were deficient. The court repeatedly gave a limiting instruction, both during trial and in the final charge to the jury. The instruction in the final charge simply recited the entire list of permitted purposes in Rule 404(b). The instructions given during trial varied. Some listed all of the purposes permitted by the rule, others listed all but identity or absence of mistake or accident, and one stated that the evidence could be used only as proof of knowledge.

■ The limiting instructions were overbroad. The evidence was admitted only to prove intent and knowledge to commit the charged conspiracy, and as direct evidence of the charged crimes of money laundering and Dennis' 1992 cocaine sale, but the instructions permitted the jury to consider the evidence as proof of identity, plan, preparation, and motive, none of which were in issue. "Laundry list" limiting instructions that simply recite all of the purposes listed by Rule 404(b) are disapproved because they do not adequately advise the jury of the limited purposes for which the evidence was admitted. *See United States v. Patterson,* 20 F.3d 809, 813, n. 3 (10th Cir.), *cert. denied* — U.S. ——, 115 S.Ct. 128, 130 L.Ed.2d 72 (1994).

■ Moreover, the court's instructions did not expressly advise the jury that it could not consider prior misconduct as proof of criminal disposition or propensity, which is what Rule 404(b) is intended to prevent. *See United States v. Fitzherbert,* 13 F.3d 340, 343 (10th Cir.1993), *cert. denied* — U.S. ——, 114 S.Ct. 1627, 128 L.Ed.2d 351 (1994). Instead, the court instructed that the prior misconduct evidence could not be considered as proof of guilt. This part of the instruction was actually overly favorable to defendants, but was likely very confusing to the jury.

In addition, the jury was not specifically instructed that, although it could consider the evidence of Dennis' and Marcel's prior misconduct as proof of the money laundering charge and 1992 cocaine sale charges, it could not consider that evidence as proof of the conspiracy, except to the extent that it proved intent. *Cf. United States v. DeLuna,* 10 F.3d 1529, 1532 (10th Cir.1993) (court instructed jury it could consider evidence of defendant's prior misconduct only as proof of the charge of which it was direct evidence, and not as proof of other charge).

■ We conclude that any error in the admission of the evidence and in the limiting instructions was harmless. Review of the entire record shows that the overbroad instruction and any error in admitting the evidence was harmless error. There was very substantial evidence against Dennis, Marcel, and Frederick other than the evidence of

their prior crimes or misconduct. In fact, the evidence was overwhelming, particularly against . Frederick and Marcel, who were caught on the August 6 videotape negotiating the cocaine purchase. *See Birch,* 39 F.3d at 1094. *See also Doran,* 882 F.2d at 1525 (overbroad limiting instruction not plain error).

## IX. Other Evidentiary Issues Wire Transfer Documents

Marcel contends the trial court erred by admitting documents without sufficient foundation showing he and other defendants sent and received cash by wire transfer. He argues the government failed to authenticate the documents under Fed.R.Evid. 901. At trial, Marcel objected only to the relevancy of the wire transfer documents, and not to lack of foundation. That objection was raised by other defendants and only against certain of the documents which did not show wire transfers to or from Marcel.

We review the admissibility of evidence over the relevancy objection only for abuse of discretion. *Patterson,* 20 F.3d at 815. The wire transfer documents were relevant to prove the money laundering charge. There was evidence that drug dealers frequently transfer large amounts of cash by wire to avoid scrutiny by the Internal Revenue Service. *See United States v. Blackman,* 904 F.2d 1250, 1257 (8th Cir. 1990).

Admission of documents to which other defendants raised a foundation objection could not have prejudiced Marcel. Those documents represented wire transfers to or from Dennis. Marcel was neither the sender nor the recipient. Their admission into evidence could not have prejudiced Marcel, against whom the evidence was overwhelming. Any error in admitting the documents was harmless.

The sufficiency of the foundation for documents to which no one raised a foundation objection may be reviewed only for plain error. *United States v. Barbee,* 968 F.2d 1026, 1031 (10th Cir.1992). It was not plain error to admit the documents showing transfers to or from Marcel. He admitted

the authenticity of Exhibits 100, 106, 107 and 108, and the authenticity of Exhibits 101 and 109 was later established by the government's handwriting expert. See Fed.R.Evid. 901(b)(1) and (3).

## Vehicle Repair Receipt

Marcel contends the court erred by admitting evidence of a vehicle receipt signed by a "Dennis" to impeach a witness who denied that Dennis had control over the van containing two and a half kilos of cocaine in January 1993. He now argues there was an insufficient foundation for admitting the evidence. Any error in the admission of this one piece of evidence against Dennis could not have prejudiced Marcel, against whom the evidence was overwhelming; again, he was caught on the August 6 videotape negotiating the cocaine deal.

## Marcel Hardwell's Ownership of Two Guns

Marcel asserts in passing that the court erred by admitting evidence that he owned two guns. He has waived this issue by failing to make any argument or cite any authority to support his assertion. *See United States v. Cody,* 7 F.3d 1523, 1526 (10th Cir.1993); *United States v. Evans,* 970 F.2d 663, 671 (10th Cir.1992), *cert. denied* 507 U.S. 922, 113 S.Ct. 1288, 122 L.Ed.2d 680 (1993). Further, in light of the overwhelming evidence against Marcel, any error in admitting the evidence was harmless.

## X. Trial Court's Comments

Frederick contends he was prejudiced by comments made by the district court in response to the efforts of Myron's attorney to show that the government's highlight videotape did not include all conversations by defendants and the undercover officer.

Because the surveillance tape of the undercover officer's room was several hours long, and included long periods during which nothing occurred, the government offered a transcript and a condensed "highlights" videotape that purported to include all the recorded conversations in the room. When Myron's

attorney began to cross-examine the officer about why the highlights tape was shorter than the full tape, the district court called a bench conference, and told counsel it was his understanding that everyone had agreed the highlights tape was accurate and the full tape was unnecessary. He told counsel that if he persisted in his attempt to suggest that the government had left something significant out of the highlights tape, he would play the complete tape with all of its dead time to the jury. The court cut off counsel's attempt to explain that he had just discovered that some 30 seconds of conversation was not on the highlights tape, and ended the bench conference.

Counsel resumed the line of questioning concerning the length of the highlights tape. Without calling a bench conference, the court admonished counsel for improperly suggesting that the government had deleted or misconstrued the recorded conversations in making the highlights tape. The court said counsel had agreed to the use of the highlights tape, and if counsel wanted the jury to see something on the full tape, the court would play the entire tape to dispel the impression that there was something improper about the highlights tape. Counsel responded there was only one page from the transcript that was not on the highlights tape, and the court ruled "If it will make you happy, we'll play that part." R VI 351.

The court called a recess and, in chambers, all defendants moved for a mistrial based on the court's comments to counsel. The court conceded it was irritated at the suggestion that the tape was incomplete and altered because the court believed counsel had agreed to use of the highlights tape. Counsel for Calvin insisted the defense had opposed the use of the highlights tape at the first trial, and had intended to preserve their objections to it on retrial. The court denied the motion for mistrial, and repeated its ruling that the jury could hear the part of the full tape with the conversation that had been omitted from the highlights tape.

The court's comments concerning the highlights tape were not sufficiently prejudicial to require reversal. The court's initial comments at the bench conference and final comments in chambers could not have been prejudicial because they could not have been heard by the jury. *See United States v. Vreeken*, 803 F.2d 1085, 1092–93 (10th Cir. 1986), *cert. denied* 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987). The remaining comments that could have been heard by the jury were minor incidents in a long trial and, although they may have attacked counsel's integrity, they did not indicate a belief in the defendants' guilt. *See United States v. Buchanan*, 787 F.2d 477, 487 (10th Cir.1986). Further, the court implicitly conceded counsel had made a valid point by permitting the jury to hear the additional portion of the tape counsel requested.

Moreover, it is unlikely that the jury was unduly influenced by the comments. They were directed at Myron's attorney, and the jury did not convict Myron. It is difficult to see how the comments could have been prejudicial to Frederick.

Frederick also contends he was prejudiced by the court's comments on the undercover officer's inability to identify Dennis' voice on a tape prepared by defense counsel. On cross-examination by Dennis' counsel, the undercover officer testified that during the first trial, she was unable to identify Dennis Hardwell's voice from a recording prepared by defense counsel. This evidence was important because it challenged the officer's identification of Dennis as the person who did most of the negotiating over the phone.

When Myron's attorney began to question the officer on the same subject, the court sustained the government's objection that it was repetitive. Counsel then asked to play the tape of Dennis' August 5 conversation with the informant, which was the basis for the officer's identification of Dennis' voice on August 6, and asked to approach the bench. Apparently in the hearing of the jury, the court responded:

I understand what you're doing, and you want to make reference to a tape that was used by Mr .Sanborn where four people were transcribed (sic) and they read something out of the Constitution. You're going to play that tape, you play the other [too] so this jury can understand why she couldn't make the difference as anyone in

this room couldn't really make the difference. Go ahead, Mr. Kerns, play them both.

R VI 374. Dennis and Calvin moved for a mistrial, which the court denied.

 The court expressed an opinion that the evidence of the officer's inability at the first trial to identify Dennis' voice had little probative value. Although a district court has the prerogative to comment on the evidence to assist the jury, the court's comments should not be one sided, and should make it clear that the jury is not bound by the court's views on the evidence, but is free to decide for itself all questions of fact. *See United States v. Jaynes,* 75 F.3d 1493, 1503 (10th Cir.1996); *United States v. Mobile Materials,* 881 F.2d 866, 877 (10th Cir.1989), *cert. denied* 493 U.S. 1043, 110 S.Ct. 837, 107 L.Ed.2d 833 (1990). The court should not have expressed its opinion that the officer's misidentification had little probative value. However, the comment was not prejudicial to Frederick. It was a small incident in a long trial, and the evidence on which the court commented concerned the officer's identification of Dennis' voice. There was no question of Frederick's identity. He was on the August 6 videotape of the negotiations in the motel room. Moreover, the comment was directed at counsel for a defendant who was not convicted, indicating the jury was not unduly influenced by the comment.

## XI. Prosecutorial Misconduct

Adam contends the government committed gross prosecutorial misconduct by introducing into evidence an identification of his voice on tapes of the August 6 conversations by a detective who did not hear the taped conversations in person. He argues this evidence was facially inadmissible and so prejudicial that a mistrial was required.

The government presented no evidence identifying the voice of the "Adam" who participated in the drug negotiations over the phone as that of Adam until Detective William Crawford testified on re-direct that he had identified Adam's voice from listening to the tapes and hearing Adam speak both in person and on tapes of his court appearances. There was no immediate objection to Craw-

ford's identification of the voice. When the government asked to play the tapes of Adam's court appearances for the jury, counsel for Adam objected for lack of foundation and the government's failure to comply with Fed.R.Crim.P. 16 by producing the tapes before trial. The court sustained the discovery objection and announced in a bench conference its intention to admonish the jury to disregard the voice comparison evidence, but the court did not admonish the jury when the conference ended. The court later denied Adam's motion for a mistrial for gross government misconduct in discovery.

 Adam now argues for the first time that the detective's opinion was facially inadmissible because he did not hear the recorded drug negotiations by "Adam" in person and was not qualified as an expert in voice identification. Because Adam did not raise this objection before the district court, we limit our review to determining whether the admission of this evidence was plain error.

 The detective's opinion was not facially inadmissible merely because he did not hear the telephone conversations with "Adam" firsthand. Fed.R.Evid. 901(b)(5) permits "[i]dentification of a voice, *whether heard firsthand or through* mechanical or electronic transmission or *recording,* by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." (Emphasis added.) Because the detective later heard Adam's voice both in person and on a tape of his court appearance, he could identify the voice on the tape of the drug negotiations under Rule 901(b)(5). *See United States v. Cox,* 449 F.2d 679, 690 (10th Cir.1971), *cert. denied* 406 U.S. 934, 92 S.Ct. 1783, 32 L.Ed.2d 136 (1972). Nor was the detective required to be an expert in voice identification. Expert testimony is not required for identification of a voice. *See United States v. Axselle,* 604 F.2d 1330, 1338 (10th Cir.1979); Fed.R.Evid. 901(b)(5), Notes of Advisory Committee on 1972 Proposed Rules.

Consequently, Fed.R.Crim.P. 16 did not require the government to disclose Crawford's opinion before trial. Rule 16(a)(1)(D) requires disclosure of the results of physical

or mental examinations and scientific examinations or tests. Rule 16(a)(1)(E) requires disclosure of experts' opinions. It does not require disclosure of the opinions of lay witnesses. Fed.R.Crim.P. 16, Advisory Committee Notes, 1993 Amendment. The government may have been required to disclose the tapes of Adam's court appearances under (a)(1)(A), but the objection to the tapes was sustained and they were not played to the jury.

The government's introduction of the evidence was not gross prosecutorial misconduct and, in any event, was not so prejudicial that it required the court to declare a mistrial. The evidence identifying Adam as the "Adam" who participated in the drug negotiations was not as weak as Adam asserts in his brief. Adam was in the same car as Dennis when they were arrested in the motel parking lot, and an officer had earlier seen a man wearing the same multi-colored shirt as Adam in a car with Dennis in the motel parking lot, and observed Dennis speaking on a cellular phone. The undercover officer identified Dennis by voice as one of the persons who negotiated for the drugs over the phone, and records showed the cellular phone found in the car with Dennis and Adam had been used to call the undercover officer at the motel.

## XII. Supplemental Jury Instruction

Dennis contends the district court erred in its response to a question from the jury about conspiracy. During deliberations, the jury inquired if Dennis' discussion of the cocaine purchase with the confidential informant the day before the meeting at the motel constituted a conspiracy. The court responded that merely talking to a government informant about buying cocaine is not conspiracy but, if proved beyond a reasonable doubt, it could be considered as evidence against Dennis if it was knowingly done in furtherance of an object of a conspiracy. Dennis' assertion that the instruction was given over defense objections is not supported by the record.

Dennis argues the supplemental instruction erroneously permitted the jury to conclude a conspiracy existed between him and the government informant. Such an instruc-

tion would have been erroneous, *see Barboa,* 777 F.2d at 1422, but the supplemental instruction did not tell the jury it could find a conspiracy between Dennis and the informant; it did just the opposite.

## XIII. Eyewitness Identification Instruction

In his reply brief, Dennis contends the district court erred by refusing his request for an instruction on eyewitness identification. Issues raised for the first time in a reply brief will not be considered. *See United States v. Tisdale,* 7 F.3d 957, 961 n. 3 (10th Cir.1993), *cert. denied* — U.S. —, 114 S.Ct. 1201, 127 L.Ed.2d 549 (1994).

## XIV. Ineffective Assistance of Counsel

Marcel asserts he received ineffective assistance of counsel. Ineffective assistance claims raised on direct appeal are presumptively subject to dismissal. Such claims should be raised in collateral proceedings rather than on direct appeal to permit development of a factual record sufficient for effective review. *United States v. Galloway,* 56 F.3d 1239, 1240 (10th Cir.1995). Marcel's appeal on his ineffective assistance of counsel claim is denied without prejudice to his right to reassert this claim in a collateral proceeding.

## XV. Sentencing—Dennis Hardwell's Role as Leader or Organizer

Dennis contends that in sentencing him, the court erred by adding four points to his offense level for his role as leader or organizer of an criminal activity involving five or more persons under § 3B1.1 of the United States Sentencing Guidelines.

The government must prove a defendant's leadership role by a preponderance of the evidence, and the sentencing court must make specific findings of fact on that role. *See United States v. Pelliere,* 57 F.3d 936, 940 (10th Cir.1995). Findings of fact on the issue are reviewed only for clear error. *Id.* Section 3B1.1(a) applies when there is proof by a preponderance of the evidence that the defendant was an organizer or leader, and that the criminal activity in-

volved five or more participants. *See Torres,* 53 F.3d at 1142. A leader or organizer must have exercised some degree of control over others in the commission of the offense or have been responsible for organizing others for the purpose of carrying out the offense. *See Robertson,* 45 F.3d at 1448.

■ Dennis bases his argument that the evidence of his leadership role is insufficient on an assertion that the undercover officer's identification of his voice was not adequately authenticated under Fed.R.Evid. 901. That assertion is unfounded. The officer's identification of Dennis' voice from hearing his voice while conducting surveillance of Dennis' meeting with the confidential informant was a sufficient foundation under 901(b)(5). *See Cox,* 449 F.2d at 690. Her inability to identify his voice on a tape prepared by defense counsel did not render her identification of his voice on August 6 inadmissible for lack of foundation.

■ There was sufficient evidence to support the court's finding that Dennis was a leader or organizer in the conspiracy to distribute cocaine. There was direct evidence that he exercised control over others by giving instructions over the telephone to Frederick and Marcel, and by giving instructions to Adam, who handed the phone to Dennis when Dennis demanded it. In addition, the evidence supports an inference that he exercised overall leadership of the conspiracy. Dennis made the initial August 5 arrangement with the confidential informant, and the evidence supports an inference that he directed the August 6 operation from the car.

■■ Dennis also challenges the finding that at least five persons were involved,

arguing that he could not be included and that Myron and Calvin could not have been participants because they were not convicted. This argument is without merit. In determining whether there were five or more participants, the defendant is included. *See Robertson,* 45 F.3d at 1448. Participants must be criminally responsible for the commission of the offense, but need not have been convicted of the crime for which the defendant is sentenced. *United States v. Allemand,* 34 F.3d 923, 931 (10th Cir.1994); U.S.S.G. § 3B1.1, Application Note 1. Accordingly, Myron and Calvin could be counted as participants with Dennis, Marcel, Frederick, and Adam.

## XVI. Sentencing—Drug Quantity Determination

Marcel, Frederick, and Adam contend the district court erred in imposing sentence based on a determination that they negotiated to possess two kilograms of cocaine. They base this argument on Application Note 12 to U.S.S.G. § 2D1.1, which at the time of sentencing provided in pertinent part:

> In an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount. However, where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing.[2]

Defendants argue that, although the amount under negotiation was two kilograms,

---

2. Note 12 was amended in November 1995. It now reads:

> In an offense involving an agreement to sell a controlled substance, the agreed upon quantity of the controlled substance shall be used to determine the offense level unless the sale is completed and the amount delivered more accurately reflects the scale of the offense. For example, a defendant agrees to sell 500 grams of cocaine, the transaction is completed by the delivery of the controlled substance—actually 480 grams of cocaine, and no further delivery is scheduled. In this example, the amount delivered more accurately reflects the scale of

the offense. In contrast, in a reverse sting, the agreed-upon quantity of the controlled substance would more accurately reflect the scale of the offense because the amount actually delivered is controlled by the government, not by the defendant. If, however, the defendant establishes that he or she did not intend to provide, or was not reasonably capable of providing, the agreed-upon quantity of the controlled substance, the court shall exclude from the offense level determination the amount of controlled substance that the defendant establishes that he or she did not intend to provide or was not reasonably capable of providing.

there was no evidence that they intended to and could produce the negotiated price for that amount. Defendants had just under $10,000 with them during the negotiations with the undercover officer, and brought only $6,910 into the hotel, which was enough to buy less than one kilogram at the agreed $15,000 per kilo price. During negotiations in the motel room, they expressed interest in buying only one kilo, and there was some evidence that they said they only had enough money for one kilo. They argue that under Note 12, the applicable amount is the amount they could pay for, rather than the amount they said they wanted to buy.

█ A sentencing court's factual findings on the quantities of drugs attributable to a defendant are reviewed for clear error, while legal issues are reviewed de novo. *See United States v. Bara,* 13 F.3d 1418, 1420 (10th Cir.), *cert. denied* —— U.S. ——, 114 S.Ct. 1662, 128 L.Ed.2d 378 (1994).

█ The first sentence quoted from Note 12 applies whether a defendant was negotiating to sell to or to buy from government agents or informants. It applies to offenses "involving negotiation to traffic in a controlled substance," which is broad enough to include purchases as well as sales. *See, e.g., United States v. Adames,* 901 F.2d 11, 12 (2d Cir.1990). The applicable amount of drugs in a "reverse sting" is the amount under negotiation. *See Bara,* 13 F.3d at 1420.

Whether the second sentence quoted from Note 12 applies in reverse stings is unsettled. On its face, it applies only when the defendant lacks the intent and ability to produce the amount of drugs under negotiation. The Second Circuit has held it is inapplicable to reverse stings. *See United States v. Alaga,* 995 F.2d 380, 382–83 (2d Cir.1993), *cert. denied* —— U.S. ——, 114 S.Ct. 886, 127 L.Ed.2d 80 (1994). *But see United States v. Vargas,* 986 F.2d 35, 41 (2d Cir.), *cert. denied* —— U.S. ——, 114 S.Ct. 91, 126 L.Ed.2d 59 (1993) (applying both parts of note to reverse sting).

However, the majority of courts that have addressed the issue have applied both parts of the note to reverse stings. *See United*

*States v. Naranjo,* 52 F.3d 245, 250 (9th Cir.1995); *United States v. Fowler,* 990 F.2d 1005, 1006–07 (7th Cir.1993); *United States v. Nichols,* 986 F.2d 1199, 1204 (8th Cir. 1993); *United States v. Brown,* 985 F.2d 766, 768–69 (5th Cir.1993); *United States v. Gates,* 967 F.2d 497, 500 (11th Cir.), *cert. denied* 506 U.S. 1011, 113 S.Ct. 632, 121 L.Ed.2d 563 (1992); *United States v. Panet–Collazo,* 960 F.2d 256, 260–61 (1st Cir.), *cert. denied* 506 U.S. 876, 113 S.Ct. 220, 121 L.Ed.2d 158(1992); *United States v. Brooks,* 957 F.2d 1138, 1150–51 (4th Cir.), *cert. denied* 505 U.S. 1228, 112 S.Ct. 3051, 120 L.Ed.2d 917 (1992). This circuit has not decided the issue. In *Bara,* 13 F.3d at 1420, the defendant did not argue inability and lack of intent, and the court did not address that issue.

█ Assuming without deciding that the second sentence quoted from Note 12 applies to reverse stings, it is a defendant's intent and ability to obtain the negotiated amount of drugs rather than intent and ability to pay the negotiated price that is crucial. A drug buyer who lacks the full purchase price may nonetheless intend to obtain the negotiated quantity by force or deception, or on a credit or consignment basis. A defendant's intent and ability to pay the full purchase price for the negotiated amount of drugs is not determinative of his or her intent or ability to obtain the drugs, although it may be relevant.

The second sentence quoted from Note 12 would be inapplicable in this case. In rejecting defendants' arguments that the relevant drug quantity was limited to the amount that could be purchased for the $6,910 they brought to the motel room, the court noted defendants were convicted of conspiracy with *intent* to distribute two kilos of cocaine, in effect finding they intended to obtain the two kilos.

Intent to obtain the negotiated amount precludes application of the second sentence of Note 12 even if defendants lacked the ability and intent to pay the negotiated price. To the extent the second sentence can apply to reverse stings, it would require exclusion of quantities only if a defendant lacked *both* intent and ability to obtain them. *See Unit-*

*ed States v. Muniz,* 49 F.3d 36, 39 (1st Cir.1995); *United States v. Raven,* 39 F.3d 428, 434 (3d Cir.1994).

The district court's findings are not clearly erroneous. The record supports the finding that defendants had the intent to obtain the negotiated amount of drugs—two kilos. Defendants' possession of less than $10,000 at the motel did not compel an inference that they lacked the ability to pay more. *See. United States v. Barnes,* 993 F.2d 680, 684 (9th Cir.1993), *cert. denied* —— U.S. ——, 115 S.Ct. 96, 130 L.Ed.2d 46 (1994). The record shows they claimed the ability to pay and there was evidence that they had purchased large amounts of drugs in the past. *See Vargas,* 986 F.2d at 41.

The record is sufficient to support an inference that defendants intended to obtain the drugs and worry about paying for them later, if at all. Their actions were consistent with taking possession of the entire amount. Once in possession, they could promise to pay later. "Fronting," or supplying drugs on consignment or on credit, is a known practice among drug dealers. *See Torres,* 53 F.3d at 1133.

Even if defendants did not intend to pay more than the $6,910 they brought to the room, the evidence supports an inference that they intended to take possession of the two kilos. The undercover officer feared a "jack" or theft, and while defendants knew she was armed, they believed she was outnumbered. Although no gun was found at the motel, defendants had access to guns. The district court's finding that defendants intended to obtain the two kilos of cocaine is not clearly erroneous.

Adam raises a sentencing entrapment issue based on 2D1.1, Application Note 17, effective November 1, 1993, before sentencing, which provides:

> If, in a reverse sting (an operation in which a government agent sells or negotiates to sell a controlled substance to a defendant), the court finds that the government agent set a price for the controlled substance that was substantially below the market value of the controlled substance, thereby leading to the defendant's purchase of a significantly greater

quantity of the controlled substance than his available resources would have allowed him to purchase except for the artificially low price set by the government agent, a downward departure may be warranted.

▓▓ Adam argues the $15,000 per kilo price was substantially below market value for cocaine in Wichita. He points to the undercover officer's testimony that the market price of a kilo of cocaine in Wichita was $25,000. However, the undercover officer was posing as a courier from Los Angeles, where the market price was $12,000 to $18,000, and she testified that the price was presented as a discount for the first transaction in a continuing business relationship. She also testified that in a reverse sting operation, an excessively low price would create a lot of suspicion and put the undercover officer at greater risk. The trial court's finding that the $15,000 per kilo price was reasonable is supported by the evidence.

## XVII. Cross–Appeal—Exclusion of Uncharged Quantities from Base Offense Level

The government contends in its cross-appeal that the court erred by failing to include the quantities of cocaine to which Dennis and Marcel had been linked *before* August 6 as relevant conduct for purposes of sentencing. Although the presentence report has not been provided to this court, the sentencing hearing transcript shows that the report recommended a base level of 32 points based on 6.5 kilos of cocaine. This amount included the two and one-half kilos seized from Dennis in Texas in the January 1993 traffic stop and the two kilos involved in the failed reverse sting operation at the Wichita Suites Hotel in April 1993, all of which the court excluded, thereby reducing the base level to 28 points. The court found the report "reasonably accurate" but made no specific findings on those prior incidents because it reasoned that defendants could not be sentenced for acts for which they were not charged and of which they had not been found guilty.

▓▓ We first reject Dennis' argument that inclusion of the cocaine from the January 1993 Texas traffic stop violated the dou-

ble jeopardy clause because he is being prosecuted in Texas for possession of that cocaine. Use of evidence of related criminal conduct to enhance a defendant's sentence for a separate crime does not constitute punishment for that conduct within the meaning of the double jeopardy clause. *Witte v. United States,* —— U.S. ——, —— — ——, 115 S.Ct. 2199, 2204–07, 132 L.Ed.2d 351 (1995).

▊ The district court erred in ruling that defendants' sentences could not be based on acts of which they were not convicted. Application Note 12 to U.S.S.G. § 2D1.1 provides: "Types and quantities of drugs not specified in the count of conviction may be considered in determining the offense level. *See* § 1B1.3(a)(2)." Under U.S.S.G. § 1B1.3(a)(2), uncharged drug quantities must be considered if they were part of the same course of conduct or common scheme or plan as the offense of conviction. Application Note 3 to § 1B1.3 states that under subsection (a)(2), conduct of which the defendant has not been convicted is included if it was part of the same course of conduct or common scheme or plan as the offense of conviction. The guidelines therefore direct the sentencing court to include amounts of drugs for which the defendant has not been charged or convicted if they are part of the same course of conduct or common scheme of plan as the offense of conviction. *See Deninno,* 29 F.3d at 578.

Offenses are part of a common scheme or plan if they are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi.*" U.S.S.G. § 1B1.3, Application Note 9(A). The record could support the inference that Dennis' transporting drugs in Texas in January 1993 had the same purpose as the charged conspiracy, to obtain two kilos of cocaine powder for distribution in Wichita. However, there were no common accomplices, and the methods were different; in the January 1993 Texas traffic stop incident, Dennis personally transported the cocaine from the source, while in the charged conspiracy, none of the defendants personally transported the cocaine. The unsuccessful

April 1993 Wichita Suites Hotel transaction had the same purpose and method as the charged conspiracy.

In addition, offenses that are not sufficiently related to be part of a common scheme or plan are part of the same course of conduct if they are "sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3, Application Note 9(B). Relevant factors include "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." *Id.* The acts need not be connected by common participants or a common scheme. The inquiry is whether the defendant repeated same type of criminal activity over time, or engaged in an identifiable behavior pattern of specific criminal activity. *See Richards,* 27 F.3d at 468.

The record could support findings that the offense of conviction and the January 1993 and April 1993 incidents were part of the same course of conduct; there was evidence that all involved the purchase or transportation of approximately two kilos of cocaine for distribution in Wichita, and the incidents occurred three or four months apart. *See Roederer,* 11 F.3d at 979. However, the district court made no specific findings on these issues. Accordingly, we must remand the case for further findings of fact.

▊ Marcel argues there was insufficient evidence tying him to the January 1993 and April 1993 incidents. Evidence connecting a defendant to additional drug quantities must have sufficient minimum indicia of reliability. *See Richards,* 27 F.3d at 468. Marcel's own statements could meet that requirement, and could support a finding that he was involved in the two earlier incidents. His statements in the undercover officer's motel room that "we" had a cocaine source in Houston and had lost four kilos suggests he was involved in both incidents, in which police intercepted a total of approximately four kilos of cocaine intended for distribution in Wichita by Dennis. Marcel's offer to give the police a major source of cocaine in Houston after his arrest also suggests some involvement in the Texas incident. His testimony that he heard the

police talking in the background over the phone during the April 1993 reverse sting operation at the Wichita suites Hotel, and the evidence that he asked the informant in the April incident why he was trying to set Dennis up tend to show Marcel's involvement in the April 1993 incident. However, the district court made no findings on Marcel's involvement in the two prior incidents. We must also remand for further findings on this issue.

■ We reject the government's contention that another two kilograms of cocaine must be included for sentencing purposes. The government argues the district court should have converted the $40,000 seized from Dennis at the Dallas/Fort Worth Airport to its equivalent of two kilograms of cocaine. It is true that cash attributable to drug transactions that are part of the same course of conduct, common scheme, or plan as the offense of conviction can be converted to its equivalent in drugs for sentencing. *See Rios*, 22 F.3d at 1027–28.

■ However, the government did not object to the omission of these additional two kilos from the presentence report until sentencing, contrary to Fed.R.Crim.P. 32(b)(6)(B). The reason offered by the government for its not raising the question earlier was that the evidence had come in at trial and was no surprise to defendants. The court noted the objection and made no finding of good cause permitting the government to raise a new objection at sentencing. The court was not required to hear the government's new objection to the presentence report at sentencing. *See United States v. Lopez–Cavasos*, 915 F.2d 474, 476–79 (9th Cir.1990) (applying local rule requiring objections to presentence report to be made before sentencing.)

### Conclusion

We AFFIRM the convictions and sentences of **Frederick Bowens** and **Adam Stallings**.

We AFFIRM **Dennis Hardwell's** convictions, VACATE his sentence, and REMAND to the district court for resentencing based on further findings of fact on whether the drug quantities involved in the January 1993 Texas incident and the April 1993 Wichita Suites Hotel reverse sting operation are part of a common scheme or plan or the same course of conduct as the offenses of conviction.

We AFFIRM **Marcel Hardwell's** conviction of conspiracy, REVERSE his conviction of money laundering, VACATE his sentence, and REMAND for resentencing after further findings of fact on his involvement in the January 1993 Texas incident and the April 1993 Wichita Suites Hotel incident and on the drug quantities involved in those incidents.