*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1559**

State of Minnesota,
Respondent,

vs.

Ashley Ann Johnson,
Appellant.

**Filed September 6, 2016
Affirmed in part, reversed in part, and remanded
Muehlberg, Judge**＊**

Dakota County District Court
File No. 19HA-CR-13-3133

Lori Swanson, Attorney General, St. Paul, Minnesota; and

James C. Backstrom, Dakota County Attorney, Stacy St. George, Assistant County Attorney, Hastings, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, St. Paul, Minnesota; and

Thomas C. Burman, Liz Kramer, Special Assistant Public Defenders, Stinson Leonard Street, LLP, Minneapolis, Minnesota (for appellant)


        Considered and decided by Peterson, Presiding Judge; Hooten, Judge; and Muehlberg,

Judge.

---

＊ Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**MUEHLBERG**, Judge

Appellant, Ashley Johnson, appeals from the district court judgment convicting her of aiding and abetting assault in the first degree and aiding and abetting assault in the third degree. Johnson argues that the evidence was insufficient to support her convictions, her Fifth Amendment rights were violated, the prosecutor committed misconduct in his closing argument, and she was improperly sentenced for a lesser-included offense. Because we conclude that the evidence is sufficient to support her convictions, that Johnson has not demonstrated prejudice for any possible Fifth Amendment violation, and that the prosecutor did not commit misconduct, we affirm in part. Because we agree that Johnson was impermissibly sentenced on a lesser-included offense, we reverse and remand with directions to vacate the sentence and conviction for that offense.

## FACTS

On August 9, 2011, Eagan police officers responded to a report of an assault. According to the probable cause statement, the officers "learned that there had been an ongoing dispute between neighbors about a bicycle that had been taken within the last few days," and that the owner of the bicycle, A.R., along with his friend, K.R., were the victims of the assault, but only the charges involving K.R. are addressed here.

The dispute began when A.R. accused P., Johnson's father figure, of stealing his bicycle, and it encompassed two additional confrontations between A.R. and Johnson's family. At a court trial, A.R. testified that the first confrontation escalated into "kind of a heated argument" but eventually "dissipated" and both parties walked away. The second

confrontation occurred on the day before the assault. A.R. testified that Johnson was "kind of the aggressor" during that argument, but the participants eventually dispersed without incident. The third encounter occurred on the afternoon of the assault, when A.R. was with K.R. and one of their neighbors. A.R. testified that Johnson was yelling aggressively during the incident, but he could not remember what she said. Following the argument, a woman in Johnson's family talked to both sides, eventually convincing A.R. and P. to shake hands and agree to "stop it and carry on with [their] lives." A.R. testified that after he shook hands with P., Johnson started threatening him: "She said that—she kept calling us racial slurs, saying we were going to get it, and she was going to call two racial slurs to come get us." A.R. testified that Johnson called him and his brother "half-breeds" and she told him that "she was going to have two n-----s come, like, teach [them] a lesson."

Later that day, A.R. was sitting on the street curb with K.R., when a gold-colored car drove by. A.R. testified that, a few minutes after the car passed and parked, the men in the car walked over to A.R. and K.R., accompanied by Johnson. A.R. testified that one of the men started yelling at him, "saying that [he] was trying to jump his cousin or something." While A.R. was talking to one of the men, the other punched him in the back of the head, knocking him over. A.R. testified that Johnson "was behind and to the right of the guy that punched [him] in the front of the head," about three or four feet away from him. He further testified that Johnson was "[j]ust watching" and that he did not "remember her doing anything other than standing there." Soon after falling down, A.R. lost consciousness and has no further memory of the assault. A.R. was not seriously injured.

K.R., who suffered serious injuries as a result of the assault, confirmed A.R.'s testimony regarding the argument with Johnson and her family on the day of the assault. K.R. corroborated A.R.'s testimony that Johnson was very angry during the confrontation and that she called them "half-breeds." He recalled Johnson yelling "f-ck that, f-ck you half-breeds, we're going to get some real n-----s in the hood tonight." K.R.'s description of the assault generally corroborated A.R.'s testimony, but it diverged slightly at times. First, he testified that one of the men asked A.R. about jumping his brother, not his cousin. Second, K.R. specified that the men in the gold-colored car pulled up to Johnson's house before going over to K.R. and A.R. Most importantly, K.R. specified that Johnson was yelling and indicating with her hands during the assault, which he took to mean "[t]hat these are the guys—these are the, quote-unquote, real n----s that she's going to bring to the hood tonight. And this was the situation that was going to occur after the handshake." K.R. testified that the last thing he remembered before he lost consciousness was Johnson being "very loud and obnoxious" and that she was "saying things like f-ck."

The state also presented evidence on the subsequent investigation and K.R.'s injuries. Because most of these facts are not relevant on appeal, we note only a few salient facts. K.R. suffered serious injuries, including a broken nose, shattered teeth, a puncture wound on his lip, and swelling. Also, in the course of the investigation, A.R. was given a breath test and his alcohol concentration registered as 0.09. Both A.R. and K.R. testified that they had been drinking beer on the day of the incident.

In addition to the above testimony and other evidence, the state offered the transcript of a statement that Johnson made at a previous hearing. At that hearing, Johnson asked to

4

address the court on the record, then proceeded to explain that she wanted a different public defender. As part of her explanation, Johnson said, "She wanted me to lie under oath and say that I wasn't there, and I was there." Johnson was represented at the time, her attorney was present, and she had been advised of her Fifth Amendment rights at her first appearance.

At trial, Johnson made a motion in limine to prohibit the state from introducing her statement, arguing that it was inadmissible as a statement made during a plea discussion; that it was more prejudicial than probative; that she was effectively without counsel, "given that it was in the context of her attempting to request a new attorney"; and that she was "not at that date advised of her right to remain silent or her right against self-incrimination." The state opposed Johnson's request, arguing that the statement was highly probative and was made in open court. The district court denied Johnson's request, finding there was "sufficient indicia of reliability," that the statement was voluntarily made, and that Johnson was represented by an attorney at the time she made the statement.

Following the rest of the evidence and closing arguments,[1] the district court found Johnson guilty of both charged offenses involving K.R. only. On June 26, 2015, a sentencing hearing was held. At the hearing, the state specifically stated that, even though Johnson had been convicted of first-degree and third-degree assault, "[t]he Court should only sentence [her] on the first degree assault [because] the third degree assault is a lesser included [offense]." The district court then made its sentencing decision on the record, explaining that "[w]ith regard to assault in the first degree, the Court is going to stay the imposition of

---

[1] The content of the prosecutor's closing argument is relevant to an issue on appeal, but we will address it under issue III to avoid repetition.

sentence." The district court granted Johnson a dispositional departure and placed her on probation for five years with anger management and 15 days sentenced-to-serve. On the same day, the district court signed a sentencing order imposing a sentence only on the third-degree assault conviction and sentenced Johnson to ten years of probation instead of five. In February 2016, after Johnson had already filed a notice of appeal, the district court issued an amended sentencing order reducing her probation to five years but imposing concurrent sentences on both convictions.

## D E C I S I O N

### I. Sufficiency of the evidence

"When reviewing the sufficiency of the evidence leading to a conviction, [appellate courts] view the evidence in the light most favorable to the verdict and assume that the factfinder disbelieved any testimony conflicting with that verdict." *State v. Hayes*, 831 N.W.2d 546, 552 (Minn. 2013) (quotation omitted). Appellate courts review a sufficiency-of-the-evidence claim by determining whether legitimate inferences drawn from the record evidence would allow a fact-finder to conclude that the defendant was guilty beyond a reasonable doubt. *State v. Pratt*, 813 N.W.2d 868, 874 (Minn. 2012). We assume "that the jury believed all of the state's witnesses and disbelieved any evidence to the contrary." *State v. Chambers*, 589 N.W.2d 466, 477 (Minn. 1999). This court "will not disturb the verdict if the [fact-finder], acting with due regard for the presumption of innocence" and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offenses. *Bernhardt v. State*, 684 N.W.2d 465, 476–77 (Minn. 2004) (quotation omitted). Reversal is appropriate, however, "if facts proving an essential element

6

of the offense are left more to conjecture and speculation than to reasonable inference." *State v. DeRosier*, 695 N.W.2d 97, 108 (Minn. 2005).

A person commits assault in the first degree when he or she assaults another and "inflicts great bodily harm." Minn. Stat. § 609.221, subd. 1 (2010). In addition, a person is "liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime." Minn. Stat. § 609.05, subd. 1 (2010). The intentional-aid element is comprised of two principles: (1) "the defendant knew that the alleged accomplices were going to commit a crime" and (2) "the defendant intended his presence or actions to further the commission of that crime." *State v. Taylor*, 869 N.W.2d 1, 15 (Minn. 2015) (quotations omitted). The state must prove a separate mens rea component for each principle. *State v. Huber*, 877 N.W.2d 519, 524 (Minn. 2016).

"Mere presence at the scene of a crime does not alone prove that a person aided or abetted . . . ." *State v. Ostrem*, 535 N.W.2d 916, 924 (Minn. 1995). But, "active participation in the overt act which constitutes the substantive offense is not required." *Id.* "A jury may infer the requisite state of mind from a variety of facts, including presence at the scene of the crime, [and] a close association with the principal offender before and after the crime . . . ." *State v. Bahtuoh*, 840 N.W.2d 804, 810 (Minn. 2013); *see also State v. Swanson*, 707 N.W.2d 645, 659 (Minn. 2006) (noting that the fact-finder can infer intent from the "defendant's flight from the scene of the crime with the principal"). In addition, if the record "shows that a person is present at the commission of a crime without disapproving or opposing it," the fact-finder may "consider this conduct in connection with other circumstances [to] reach the conclusion

7

that he assented to the commission of the crime, lent to it his approval, and was thereby aiding and abetting its commission." *State v. Pierson*, 530 N.W.2d 784, 788 (Minn. 1995).

### *Circumstantial or direct evidence*

As a preliminary matter, the parties disagree on whether Johnson's conviction was based on circumstantial evidence. The parties argued this issue to the district court, which did not explicitly rule on the issue but declined to apply a circumstantial-evidence analysis in its order. The parties agree on the definition of direct evidence as "personal knowledge or observation that, if true, proves a fact without inference or presumption," and agree that circumstantial evidence is "based on inference and not on personal knowledge or observation." *See Bernhardt*, 684 N.W.2d at 477 n.11 (quoting *Black's Law Dictionary* 595–96 (8th ed. 2004)). The parties disagree, however, on how to characterize the evidence supporting the mens rea requirements of Johnson's aiding-and-abetting charge.

Johnson contends that while "a fact finder may infer the requisite state of mind for aiding and abetting liability by looking to a variety of facts," such as presence, close association with the principal, and flight from the scene, "[a] witness's observation of these facts . . . is not direct evidence of a defendant's *knowledge* of or *intent* to assist in the crime." Johnson points to the testimonial evidence supporting the intent element:

- Johnson, [A.R.], and many other individuals engaged in numerous arguments before the assault. During one of those arguments, Johnson stated she was going to have two men "come get" [K.R.] and [A.R.] and "teach [them] a lesson."
- Later that evening, Johnson appeared with two men, who then attacked [K.R.].
- During the altercation, Johnson was yelling and pointing her fingers.

8

Johnson argues that these statements are still circumstantial because they require inferences to support the knowledge and intent requirements. We disagree. Johnson's statement threatening K.R. and A.R. is direct evidence that she knew the crime was going to occur and that she intended to further the commission of the crime.

Proceeding with a direct-evidence analysis, the evidence shows that Johnson threatened K.R. and A.R. on more than one occasion leading up to the assault, stating that "she was going to have two n-----s come, like, teach [them] a lesson." The two men who assaulted K.R. and A.R. drove to Johnson's home, met Johnson, then approached K.R. and A.R. together. Johnson was present during the assault and appeared to be encouraging the assault by yelling and making gestures. Because Johnson's threat is direct evidence of her knowledge of the crime and intent to further the commission of the crime, the evidence in the record is sufficient to support the district court's conclusion that Johnson aided and abetted first-degree assault. *See State v. Horst*, 880 N.W.2d 24, 40 (Minn. 2016) (concluding Horst's statements, "I want him dead," "we can do this," and asking "how many rounds did you put in him," constituted direct evidence that she knew accomplice would kill victim). Given the heavy burden she must carry to overturn a verdict, *see State v. Vick*, 632 N.W.2d 676, 690 (Minn. 2001), Johnson cannot prevail in light of the state's evidence.

**II.     Fifth Amendment**

An appellant contesting the admission of evidence "has the burden to show the admission was both erroneous and prejudicial." *State v. Riddley*, 776 N.W.2d 419, 424 (Minn. 2009). This court reviews the district court's evidentiary ruling for abuse of discretion. *See State v. Griffin*, 834 N.W.2d 688, 693 (Minn. 2013). If the appellant objected to the admission

of evidence at trial, we review the admission of the evidence under the harmless-error standard. *See State v. Matthews*, 800 N.W.2d 629, 633 (Minn. 2011). Johnson contends that the evidentiary ruling violated her Fifth Amendment right against self-incrimination. A conviction involving a constitutional error can be upheld "only if the error committed was harmless beyond a reasonable doubt." *DeRosier*, 695 N.W.2d at 106.

Johnson argues that the district court erred in admitting the statement she made at a hearing prior to trial in which she acknowledged being present at the assault. Johnson contends that because she made the statement in furtherance of her Sixth Amendment right to counsel, the district court's decision to admit it created an unconstitutional bind in which, had she known that the statement was admissible, she would have had to choose between asserting her Sixth Amendment right to effective counsel and her Fifth Amendment right against self-incrimination.

Johnson cites a line of cases holding that "statements made by a defendant in furtherance of protecting her constitutional rights cannot later be used to establish guilt in violation of her Fifth Amendment right against self-incrimination." *See State v. Christenson*, 371 N.W.2d 228, 232 (Minn. App. 1985) ("Testimony given by a defendant in support of a motion to suppress cannot be admitted as evidence of guilt at trial and can be used only for impeachment purposes, if at all."). In one case cited by Johnson, *Simmons v. United States*, 390 U.S. 377, 394, 88 S. Ct. 967, 976 (1968), the United States Supreme Court held that "when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection." In *Simmons*, the appellant testified to establish standing to

assert a Fourth Amendment claim, and after his motion to suppress failed, the state introduced his testimony against him at trial. *Id.* at 381, 88 S. Ct. at 969–70. The Supreme Court observed that, although the appellant was not compelled to testify, if he chose not to, he would give up the benefit of the Fourth Amendment.

> Thus, in this case [the appellant] was obliged either to give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination. In these circumstances, we find it intolerable that one constitutional right should have to be surrendered in order to assert another.

*Id.* at 394, 88 S. Ct. at 976.

In *United States v. Hardwell*, 80 F.3d 1471, 1483 (10th Cir. 1996), the Tenth Circuit applied *Simmons* to a criminal defendant who made a disclosure on his application seeking a public defender that was later offered against him at trial. The Tenth Circuit reversed in part, reasoning that if the defendant's statements were admissible, he "would be forced to choose between the Sixth Amendment right to counsel and the Fifth Amendment right against self incrimination." *Id.* at 1484.

Johnson does not cite any Minnesota caselaw that has applied the *Simmons* doctrine to the Sixth Amendment, but she cites a line of federal cases. *See United States v. Gravatt*, 868 F.2d 585, 589 (3d Cir. 1989) (concluding that a court cannot require a defendant to make a disclosure on an affidavit submitted to obtain a public defender where doing so "may place the defendant in the constitutionally untenable position of having to choose between his Sixth Amendment right to counsel and his Fifth Amendment privilege against self-incrimination"); *United States v. Anderson*, 567 F.2d 839, 840–41 (8th Cir. 1977) (holding that a defendant's

11

financial disclosures made to obtain a public defender should be sealed and not made available for tax prosecution, noting that "[t]o hold otherwise would force [appellant] to choose between his Sixth Amendment right to counsel and his Fifth Amendment right against self-incrimination" and calling that choice "constitutionally impermissible").

The state responds by arguing that the cases cited by Johnson are not Minnesota law and they are also distinguishable from the case at hand. The state notes that *Hardwell*, *Gravatt*, and *Anderson* all involve incriminating statements made while applying for a public defender. In this case, the state argues that Johnson already had an attorney, and it relies on *State ex rel. Cobb v. Rigg*, which states that when a defendant is "represented by competent counsel . . . it must be presumed, in the absence of an affirmative showing to the contrary, that he was advised by his attorney of his rights." 251 Minn. 208, 211, 87 N.W.2d 363, 365 (1957).

Johnson presents a novel question of whether an unprompted statement made in open court by a represented criminal defendant, who had been informed of her Fifth Amendment right against self-incrimination, as part of an attempt to assert her rights under the Sixth Amendment, is inadmissible to prove her guilt. We need not reach this issue, however, because we conclude that any error would have been harmless beyond a reasonable doubt. *See DeRosier*, 695 N.W.2d at 106 (explaining the harmless-error test). The district court did not make any findings of fact regarding the statement, suggesting that it did not rely on the statement. In addition, Johnson's presence was not contested at trial. Because K.R. and A.R. both testified to Johnson's presence at the assault, Johnson's statement was cumulative of evidence already in the record. Accordingly, we conclude that even if the district court abused its discretion by admitting the statement, the error was harmless beyond a reasonable doubt.

12

### III.    Prosecutorial misconduct

Prosecutors have "considerable latitude" in a closing argument.  *State v. Williams*, 586 N.W.2d 123, 127 (Minn. 1998).   "A prosecutor commits misconduct by intentionally misstating evidence."  *State v. Mayhorn*, 720 N.W.2d 776, 788 (Minn. 2006). But, "[a] prosecutor may draw reasonable inferences from the evidence produced at trial," *State v. Ashby*, 567 N.W.2d 21, 28 (Minn. 1997), and "is free to make legitimate arguments on the basis of all proper inferences from the evidence introduced," *State v. Outlaw*, 748 N.W.2d 349, 358 (Minn. App. 2008), *review denied* (Minn. July 15, 2008). When determining whether a prosecutor committed misconduct during a closing argument, appellate courts "consider the closing argument as a whole rather than focus[ing] on particular phrases or remarks."  *State v. Jackson*, 714 N.W.2d 681, 694 (Minn. 2006) (quotation omitted).

"On appeal, an unobjected-to error can be reviewed only if it constitutes plain error affecting substantial rights." *State v. Ramey*, 721 N.W.2d 294, 297 (Minn. 2006) (citing Minn. R. Crim. P. 31.02). "An error is plain if it is clear and obvious at the time of appeal. An error is clear or obvious if it contravenes case law, a rule, or a standard of conduct." *State v. Little*, 851 N.W.2d 878, 884 (Minn. 2014) (quotations omitted). We review claims of unobjected-to prosecutorial misconduct under a modified plain-error test. *See Ramey*, 721 N.W.2d at 302. Under the modified plain-error test, the defendant must show that the prosecutor committed error and that the error is plain. *Id.* If the defendant is successful, the burden shifts to the state to demonstrate "lack of prejudice; that is, [that] the misconduct did not affect substantial rights." *Id.* If the state fails to carry its burden, we must consider the fourth prong of the plain-error test: "whether a new trial is required to ensure the fairness, integrity, and public

reputation of judicial proceedings." *State v. Watkins*, 840 N.W.2d 21, 31 (Minn. 2013). We will reverse a conviction if the alleged misconduct, considered in light of the whole trial, impaired the defendant's right to a fair trial. *State v. Washington*, 725 N.W.2d 125, 133 (Minn. App. 2006), *review denied* (Minn. Mar. 20, 2007).

Johnson argues that the prosecutor committed misconduct by mischaracterizing the evidence in this case. The challenged portion of the prosecutor's closing argument is reproduced below:

> [K.R.] watched the defendant join them and she led the two men towards them. And he watched as the defendant yelled, she hollered, and she pointed as she walked. He watched as she directed the men towards [A.R.], where [A.R.] was knocked unconscious. Then [K.R.] watched as the defendant directed the two men towards him, hollering, spitting out slurs, viciously pointing, egging on her two thugs to hurt [K.R.].
> . . . [S]he summoned her thugs, her goons, she motivated them . . . . And she led them out to [A.R.] and [K.R.], and there she gave the command, she said sic-em. While her two thugs did what she commanded, she continued hollering and pointing until [K.R.]'s face was stomped to a bloody mess.

Although the prosecutor's use of the words "thugs" and "goons" to describe the African-American men who committed the assault seems questionable at best, Johnson does not challenge that aspect of the argument. Instead, Johnson contends that the record does not support the prosecutor's assertions that she egged them on, that she said "sic-em," that she was yelling and pointing as the two men approached, or that she "summoned her thugs" or brought the men to K.R. and A.R.

Despite Johnson's contentions otherwise, the prosecutor's characterization of the evidence is within the realm of reasonable inference. Based on K.R.'s testimony that Johnson

14

was yelling and gesturing during the fight, it is reasonable to infer that she "egged" the men on. While it is true that there is no evidence that Johnson said "sic-em," it is unlikely that the prosecutor meant to convey that she literally said "sic-em," and there is no evidence that the district court interpreted it that way. Further, based on the testimony that Johnson made threats about calling men over to "teach them a lesson," that two men showed up at her house, walked over with her, and then assaulted A.R. and K.R. while she yelled and gestured, it is reasonable to infer that Johnson summoned the men or brought them there. Accordingly, we conclude there was no plain error and need not proceed to the other phases of the modified plain-error test.

## IV.    Lesser-included offense

"Upon prosecution for a crime, the actor may be convicted of either the crime charged or an included offense, but not both." Minn. Stat. § 609.04, subd. 1 (2010). "[Appellate courts] have long recognized that the 'conviction' prohibited by this statute is not a guilty verdict, but is rather a formal adjudication of guilt." *State v. Pflepsen*, 590 N.W.2d 759, 767 (Minn. 1999). When a defendant is found guilty of more than one charge for the same act, the district court should "adjudicate formally and impose sentence on one count only. The remaining conviction(s) should not be formally adjudicated at this time." *Id.* at 766.

On review, this court "typically look[s] to the official judgment of conviction, which generally appears as a separate entry in the file, as conclusive evidence of whether an offense has been formally adjudicated." *Id.* at 767. "When this official judgment order states that a party has been convicted of or sentenced for more than one included offense, we have vacated the conviction(s)." *Id.*

Here, the warrant of commitment lists convictions of both third-degree and first-degree assault. The amended sentencing order also lists convictions of both offenses and notes that the sentences should run concurrently. It does not appear from the record that the error has been corrected.

Johnson makes two arguments in the alternative. First, she argues that her conviction and sentence for aiding and abetting first-degree assault must be vacated because she was initially sentenced for the lesser-included offense of third-degree assault. Johnson contends that although the "typical procedure in situations involving impermissible multiple convictions or sentences is to vacate the conviction for the lesser-degree offense or to vacate the less severe sentence," *see, e.g.*, *Spann v. State*, 740 N.W.2d 570, 573–74 (Minn. 2007), vacating the third-degree conviction and upholding the first-degree conviction may violate her due-process rights in this case. She cites *State v. Calmes*, 632 N.W.2d 641, 645 (Minn. 2001), for the proposition that due process "may be violated when a defendant's sentence is enhanced after the defendant has developed a crystallized expectation of finality in the earlier sentence."

While Johnson is correct that Minnesota caselaw recognizes due-process limits on the ability of a district court to modify a sentence, the supreme court noted in *Calmes* that cases involving a due-process violation will be rare. *Id.* at 647. In *Calmes*, the supreme court considered multiple factors in its due-process analysis, but ultimately concluded that "[w]hile the court's action undoubtedly dashed Calmes' hopes regarding his sentence, any expectation regarding the finality of his sentence was not reasonable" in light of Minnesota law. *Id.* at 649. Here, any expectation of finality in Johnson's original erroneous sentencing order was

16

not reasonable because the district court clearly stated at the sentencing hearing that Johnson was being convicted of and sentenced for first-degree assault. Accordingly, we reject Johnson's due-process argument.

In the alternative, Johnson argued that her conviction of third-degree assault should be vacated as an impermissible conviction of a lesser-included offense. Because this remedy is consistent with Minnesota caselaw, we agree and remand to the district court to vacate Johnson's conviction of third-degree assault and clarify her five-year probationary term.

**Affirmed in part, reversed in part, and remanded.**